BARRY P. LEVINE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levine v. Commissioner
Docket No. 15626-83.
United States Tax Court
T.C. Memo 1987-320; 1987 Tax Ct. Memo LEXIS 320; 53 T.C.M. (CCH) 1258; T.C.M. (RIA) 87320; June 25, 1987. *320 Barry P. Levine, pro se. Osmun R. Latrobe, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1979 and 1980 in the amounts of $256,948.32 and $81,945.69, respectively, and additions to tax for fraud under section 6653(b) [1] for those years in the respective amounts of $128,474.16 and $40,972.85. One issue was conceded by respondent and, although raised in the petition, other issues were not in fact contested by petitioner at the trial, leaving for our decision as contested issues the following: [2]
1. What amount of income received by petitioner from illegal sale of drugs in the taxable years 1979 and 1980 was not reported by him on his Federal income tax returns for those years; and 2. whether any part of the deficiency in tax due from petitioner for each of the taxable years 1979 and 1980 was due to fraud within the meaning of section 6653(b). *321 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Barry P. Levine, was a resident of Lompoc, California, at the time of the filing of his petition in this case. For the taxable year 1979 petitioner filed a joint Federal income tax return with his wife, and for the calendar year 1980 filed a return as a married individual filing separately. During the years 1979 and 1980 and for some years prior thereto, petitioner was the sole owner of a subchapter S corporation, Barry Discount Pharmacy, Inc., an Oklahoma corporation. This corporation owned and operated two retail pharmacies in Oklahoma City. Petitioner was a licensed pharmacist and a member of the Oklahoma Pharmaceutical Association. He was active in the work of that association and in the Drug Abuse Council of that association. Beginning in late 1978, petitioner conspired with several other individuals to illegally distribute controlled substances, Citra Forte and Valium. Petitioner would buy through his pharmacies large quantities of these drugs from reputable wholesale drug supply firms. The firms from which petitioner obtained the Citra Forte and Valium, which he illegally *322 sold, were McKesson and Robbins Drug Co., Fox-Vliet Drug Co., and Amfac Drug Supply Co. Petitioner issued checks from his pharmacies in payment for his purchases of Citra Forte and Valium which he illegally sold. The records show that petitioner paid in the vicinity of $7.80 a pint for Citra Forte and, after discount, approximately $69 a bottle of 500 tablets for Valium. There were two individuals to whom petitioner sold the Citra Forte and Valium. The sales were typically in caseload quantities of four, six or occasionally twelve cases of Citra Forte at a time and one or more cases of Valium at a time. A case consisted of twelve pint bottles of Citra Forte or twelve bottles of 500 tablets each of Valium. Petitioner received $25 per pint bottle for Citra Forte in his illegal sales, and $125 per bottle for his illegally sold Valium. The two individuals to whom petitioner sold these drugs then sold them on the street at an increased price. Petitioner's illegal sales of controlled drugs was carried on throughout the entire year 1979 and through March of 1980. Occasionally there would be a fluctuation in the amount of the drugs he sold when he became concerned of possible suspicion *323 of his activities by law enforcement agencies. In February of 1980, one of petitioner's co-conspirators was arrested for an unrelated narcotics violation. While he was being questioned by agents of the Oklahoma Bureau of Narcotics and Dangerous Drug Control and an assistant Oklahoma County District Attorney, he told of his activities with respect to the purchase of Citra Forte and Valium from petitioner and told the agents of another person to whom petitioner was illegally selling these drugs. On March 31, 1980, acting under the authority of a judicially issued administrative inspection warrant, agents of the Oklahoma Bureau of Narcotics and Dangerous Drug Control and of the Federal Drug Enforcement Agency began simultaneous inventory reviews of the two pharmacies owned and operated by petitioner. These inventory reviews consisted of thorough audits of the pharmacy's prescription records, and inventories of drugs and purchases. The agents in the audit added to the amount of physical inventory at the beginning of the period the purchases made during the period and reduced the amount by the prescription disbursements and the inventory of drugs on hand at the date of the audit. *324 The result was a reflection of shortages in the inventory on the audit date. These shortages resulted because of the disbursement of drugs without prescriptions. Since the agents were unable to get an accurate beginning inventory, they used a beginning inventory of zero in the audit they conducted on March 31, 1980, in order to give petitioner the benefit of all doubt as to the unaccounted-for quantity. The beginning inventory date for the audit was January 1, 1979, as to Barry's Discount Pharmacy, and June 21, 1979, for Barry's Uni-Med Pharmacy, the two pharmacies operated by petitioner's corporation. The June 21, 1979, date for the Barry's Uni-Med Pharmacy was used because a fire had occurred on the premises of that pharmacy on June 21, 1979, and it was therefore difficult to reconstruct records before that date. The result of these audits relating to the Citra Forte and Valium indicated the following: Drug
Barry's Discount
Uni-Med
Total
Citra Forte
-5,915 pints
-85 pints
-6,000 pints
Valium 10 mg
-386,584 tabs -8,726 tabs -395,310 tabs Valium 5 mg
-25,067 tabs +2,536 tabs -22,531 tabs Valium 2 mg
-8,004 tabs -8,004 tabs *325 The agents concluded that the overage of the Valium 5 mg at Uni-Med was the result of their using a zero beginning inventory and that this figure probably reflected the inventory at the beginning of the period. Petitioner sold at least 6,000 pints of Citra Forte in the illegal market at a price of $25 a pint, making total illegal sales of this item of $150,000. Petitioner sold at least 790 bottles of Valium 10 mg in the illegal market at $125 a bottle, making total illegal sales of this item of $98,750. Although there were shortages in the Valium 5 mg and Valium 2 mg by 45 bottles and 16 bottles, respectively, petitioner did not sell the Valium 5 mg and Valium 2 mg to the individuals who resold the drugs in an illegal market. During the period that petitioner illegally sold 6,000 pints of Citra Forte, he had pharmaceutical sales and inventory of only 45 pints. During the period that petitioner illegally sold 395,310 tablets of Valium 10 mg, there were only 28,490 tablets legally sold through prescriptions through his pharmacies or remaining in inventory at the conclusion of the period. All payments for petitioner's illegal sales of Citra Forte and Valium 10 mg were for *326 cash. Petitioner did not ring up these illegal sales on the pharmacies' cash registers. He did deposit some of the cash in his bank account and he did enter on his daily sheets some items such as wholesale sales or refund adjustments which represented some of the cash obtained from the illegal sales. Petitioner never kept or supplied to the accountant who assisted in the keeping of his records and prepared his income tax returns and the income tax returns of his subchapter S corporation a physical inventory of the drugs at his pharmacies. In the ordinary course of his pharmacy business, each of petitioner's pharmacies prepared a daily report which was provided to petitioner's accountant for the purpose of preparing income statements, balance sheets and tax returns. Each of these daily reports contained figures for total sales reflected on each of the two cash registers in each pharmacy, wholesale sales, amounts received on account, total deposits and other entries. Monthly gross receipts were totaled up from the total sales entries on the daily report of each pharmacy. The accountant would reconcile the daily report sheet total with petitioner's bank deposits. Yearly gross receipts *327 were determined by totaling the monthly gross receipt figures for each month. Petitioner would at times pay one employee her wages in cash and would not reflect this payment on his books or pay employment taxes with respect to her wages or furnish a Form W-2 to the employee. There were other employees who he would occasionally pay in cash for overtime or part-time work without reporting the payments on his books or paying employment tax on the wages or including these wages on the W-2 furnished to the employee. When petitioner would report an amount as wholesale sales, he would not be required to pay Oklahoma State sales tax on the amount. Petitioner also would sometimes show receipts from State welfare agencies and refunds from suppliers which were not subject to State sales tax. Petitioner had very little actual receipts from welfare agencies and most of the amounts he shows as receipts from welfare agencies on his daily reports were from the cash funds he received from his illegal sales. On May 5, 1980, petitioner and four individuals were indicted on twelve counts of conspiracy to distribute controlled substances, distribution of controlled substances and willfully failing *328 to keep records on the receipt and distribution of such substances. On July 24, 1980, petitioner was sentenced on his plea of guilty to three counts of the indictment relating to the distribution of Citra Forte and the failure to keep records of receipt and distribution of Citra Forte and Valium. The remaining counts of the indictment were dismissed by agreement. One of the individuals to whom petitioner sold also pleaded guilty to certain of the charges. On the income tax return of Barry's Discount Pharmacy, Inc., for the period July 1, 1978 through June 30, 1979, gross receipts of $439,174.72 were reported and cost of goods of $308,553.81 was reported leaving a gross profit of $130,621.09. Taxable income was reported on this return of $28,270.15. Petitioner's accountant based on experience through the years figured the cost of goods sold at approximnately 70 percent of gross sales. He would add up the actual purchases during the year, add this amount to the amount he showed as opening inventory, subtract the computed cost of sales from the total, and the remaining amount would be shown as closing inventory. On the return for Barry's Discount Pharmacy, Inc., for its fiscal *329 year ended June 30, 1979, an opening inventory of $38,182.82 is shown which was the closing inventory from the preceding year and a closing inventory of $47,891.41 is shown. On the U.S. Small Business Corporation tax return (Form 1120-S) of Barry's Discount Pharmacy, Inc., for its fiscal year ending June 30, 1980, gross receipts of $508,078.03, cost of goods sold of $355,660.95, gross profit of $152,426.08, and net taxable income of $18,766.88 are shown. On the balance sheet attached to this return an opening inventory of $47,891.41 is shown and a closing inventory of $71,147.21 is shown. Respondent in his notice of deficiency to petitioner for the calendar year 1979, increased petitioner's reported income by an amount of $489,126.00 shown as sales of narcotics, and for the calendar year 1980 increased petitioner's taxable income as reported by $122,281.00 shown as sales of narcotics. These amounts were computed on the street price of the Citra Forte and Valium sold by petitioner to other individuals who sold it on the street. The parties have stipulated a sales price of $25.00 a pint for Citra Forte by petitioner and of $125.00 a bottle of 500 tablets for Valium. Respondent has *330 conceded the difference in the amount computed in the statutory notice as sales of narcotics and the amount computed from the stipulated prices applied to the unaccounted for purchases of Citra Forte and Valium through the pharmacies. Respondent in the notice of deficiency also determined in each year that a part of the underpayment of tax was due to fraud and determined the addition to tax for fraud. OPINION This case is purely factual. Petitioner has the burden of showing error in respondent's determination of the deficiencies, and the burden is on respondent to show that some part of an underpayment of tax was due to fraud. Petitioner in an effort to show that the amount determined by respondent was overstated, testified that he made no illegal sales of Valium 5 mg and Valium 2 mg. He conceded the quantity of illegal sales computed by respondent for the Citra Forte and Valium 10 mgs. Petitioner also offered testimony of one of the individuals to whom he sold illegal drugs that no illegal sales were made of Valium 5 g and Valium 2 mg. Based on this evidence plus the small amount of unaccounted for inventory of those items, we conclude that petitioner did not make illegal *331 sales of Valium 5mg and Valium 2 mg. We conclude that he did make illegal sales as computed by respondent in his computation of 6,000 pints of Citra Forte at $25.00 a pint and 790 bottles of 500 Valium 10 mg tablets at $125.00 a bottle, which comes to a total of $150,000 over the 15-month period for Citra Forte and $98,750 over the same period for Valium 10 mg, making a total of $248,750 of cash received by petitioner from such illegal sales. Petitioner also contends that he deposited in his bank accounts and included in his daily report used by his accountant to compute the sales as shown on his income tax returns some amount of cash received from these illegal sales. The record is voluminous with documents consisting of the daily reports, bank statements, and numerous other documents. Although the Court specifically directed petitioner to attempt to compute from these documents the amounts of the illegal sales which in some manner were included in his reported income, petitioner after numerous extensions of time to permit the filing of a brief has filed no brief. However, from reviewing these records, it appears to the Court that some amounts of the cash were included in the *332 reported income. It appears that this was probably done by disguising the sums as wholesale sales or payments from the Welfare Department. If some amount of this cash had not been included in sales from which cost of goods sold was computed, petitioner's accountant would undoubtedly have become suspicious of the large increase in inventory. The record shows that there was approximately a $10,000 increase in inventory of the subchapter S corporation in its fiscal year 1979 and an approximate $24,000 increase in its fiscal year 1980 or a total of approximately $34,000. Certainly it appears that this amount probably was not actual inventory but was part of the cost of the illegal sales that did not in any way get accounted for so as to have some offset to purchases. It appears that the cost of the goods illegally sold by petitioner, the Citra Forte and the Valium 10 mg tablets during the entire period here involved was approximately $98,000. If $34,000 of this was not covered in any way into petitioner's bank accounts or daily reports, there would remain approximately $64,000 which was deposited by petitioner and contained in the daily reports. The burden is on petitioner to establish *333 what amount of the illegal sales was actually included in the reported income. Petitioner has shown that some of the illegal cash sales were reported but has not shown the amount. The Court has used the best figure it is able to compute from the evidence in the record of reported amounts of illegal sales which amount is $64,000. Therefore, of the illegal sales we have found of $248,750, we conclude that $64,000 was actually reported by petitioner leaving $184,750 of unreported illegal sales which constitutes income to petitioner over the 15-month period from January 1, 1979 through March 31, 1980. We agree with respondent that the only feasible way of distributing the unreported income based on the testimony in this record is to divide the amount equally among the 15 months. All costs of the illegal sales were accounted for on the returns of petitioner's subchapter S corporation. The other issue is whether respondent has shown by clear and convincing evidence that some part of an underpayment of tax was due to fraud. Unquestionably on this record respondent has made this showing. Petitioner was making illegal sales and retaining the cash and not including the greater portion *334 of it in his income. Petitioner made no effort to explain why he did not include all of the receipts from the illegal sales in his income. He tantamount to admitted that he knew these cash receipts were properly includable in his taxable income. This fact alone is enough to establish fraud. However, there is other evidence in the record supporting our conclusion that part of petitioner's underpayment of tax in each year was due to fraud. Petitioner testified that he paid cash "under the counter" to certain employees to assist them in defrauding the Government by not reporting the amount as income received. He stated that he would not include these cash payments on the W-2's furnished to the employees to assist them in reducing income tax. He further stated that he did not report these payments for employment tax. Petitioner also stated that the reason he showed wholesale sales for certain receipts of income including some of his income from illegal sales was because he did not have to pay state sales tax on wholesale sales. The whole picture here is one of an individual defrauding the Government of taxes in many ways. When he did report amounts of illegal sales, in our view *335 it was merely to keep his accountant from seeing so much difference between the amount paid by pharmacies for purchase of drugs and the amount of purchases computed by taking 70 percent of sales. In our view, petitioner had a planned scheme of defrauding the Government of taxes on the amounts he received from illegal sales. We therefore sustain respondent's determination of the addition to tax for fraud in each of the years here in issue. As we stated in the footnote at the beginning of this opinion, we conclude that other than the depreciation deduction issue for 1979 which respondent conceded petitioner has conceded the adjustments in the notice of deficiency other than the items we have considered in this opinion. He introduced no evidence to show any error in these other determinations and in fact the evidence in the record supports the correctness of respondent's determination in respect to these items. In any event the burden is on petitioner to show error in these determinations and this he has not done. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent conceded an issue with respect to depreciation for the year 1979 and petitioner introduced no evidence with respect to respondent's increase in his income as reported for the year 1980 by $18,766.88, which was his share of the undistributed taxable income of his wholly owned subchapter S corporation, Barry's Discount Pharmacy, Inc., which petitioner failed to report on his return. Petitioner likewise did not contest respondent's increase in his reported income by $792, consisting of unemployment income received from the Oklahoma Employment Security Commission, and his failure to report on his 1979 Federal income tax return a tax from recomputing prior year investment credit in the amount of $1,740 which was attributable to him from his subchapter S corporation, Barry's Discount Pharmacy, Inc. Although it is not completely clear that petitioner in fact conceded these adjustments, he offered no evidence to rebut them, and since he has the burden of proof with respect to these items, we conclude that he in effect has conceded them.↩